**FILED**
**APRIL 4, 2024**
In the Office of the Clerk of Court
WA State Court of Appeals Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38808-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH LEE STONE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Kenneth Stone, along with three codefendants, was charged with

the kidnapping and murder of Bret Snow. Mr. Stone reached a plea agreement with the

State conditioned on him providing truthful testimony in his codefendants' trials. On the

day Mr. Stone was scheduled to testify in codefendant Colby Vodder's trial, Mr. Stone's

attorney was unable to be present. In his attorney's absence, Mr. Stone furnished the jury

with untruthful testimony. Based on Mr. Stone's breach, the State withdrew the plea

agreement. Mr. Stone unsuccessfully moved the trial court to enforce the plea agreement

before later pleading guilty to second degree murder.

Mr. Stone appeals contending that he was deprived of his right to counsel under the Sixth Amendment to the United States Constitution and that the trial court erred in imposing certain legal financial obligations (LFOs) against him. We decline Mr. Stone's request to reinstate the plea agreement and remand for the court to strike certain LFOs from the judgment and sentence.

BACKGROUND

Mr. Stone and Cheryl Sutton resided together in Newman Lake. Alvaro Guajardo lived in a garage on the property that had been converted into a bedroom. Mr. Stone, Ms. Sutton, Mr. Guajardo, and Colby Vodder were engaged in the drug trade. Bret Snow sold drugs for Ms. Sutton, was financially indebted to her, and had, on occasion, stolen from her. On December 2, 2015, Mr. Snow arrived at Ms. Sutton's property and was confronted by Ms. Sutton over money that she was owed. During the confrontation, Mr. Stone bound Mr. Snow's hands. Ms. Sutton then struck Mr. Snow.

Mr. Guajardo ferried Mr. Snow to his room in the garage. Later, Mr. Guajardo and Mr. Vodder forced Mr. Snow into the trunk of a car and departed with the intent of shooting Mr. Snow and disposing of his body. They later returned to the property, claiming they were unable to find an appealing place to shoot Mr. Snow. The following day, Mr. Vodder returned to the property and went to Mr. Guajardo's room where Mr. Snow was still restrained. At some point, Mr. Snow was freed from the restraints and got

2

into a physical altercation with Mr. Vodder.  Mr. Vodder beat Mr. Snow with a metal object, severely injuring him.

Mr. Vodder and Mr. Guajardo decided that Mr. Snow was injured so badly that they needed to either take him to the hospital or kill him.  After two or three failed attempts, Mr. Guajardo "mercy kill[ed]" Mr. Snow by strangulation.  Clerk's Papers (CP) at 199.  Mr. Vodder and Mr. Guajardo then dismembered Mr. Snow's body and placed his remains into buckets.  In August 2015, members of the Spokane County Sheriff's SWAT[1] team executed a search warrant on the property in connection with the drug distribution scheme.  Mr. Stone and Ms. Sutton were subsequently indicted for conspiracy to deliver controlled substances.

Following inquiries by Mr. Snow's family regarding his disappearance, Detective Lyle Johnston of the Spokane County Sheriff's Office, obtained Mr. Snow's phone records.  The records revealed Mr. Snow had last used his phone in the Newman Lake area.  Detective Johnston contacted Karen Nelson, the last person Mr. Snow had contacted prior to his disappearance.  Through Ms. Nelson, Detective Johnston learned that Mr. Snow had been dropped off at Ms. Sutton's property prior to his disappearance.  After interviewing numerous individuals, Detective Johnston and Detective Jim Dresback believed Mr. Stone, Ms. Sutton, Mr. Vodder, and Mr. Guajardo were involved in Mr.

---

[1] Special weapons and tactics.

Snow's disappearance. Eventually, the State charged the quartet with first degree murder, or in the alternative, second degree murder, first degree kidnapping, and conspiracy to commit first degree kidnapping.

FIRST PLEA AGREEMENT

During the pendency of the investigation into Mr. Snow's disappearance, Mr. Stone was incarcerated on federal charges related to controlled substance violations. Following negotiations with both federal and State prosecutors, Mr. Stone agreed to offer testimony about Mr. Snow's disappearance and death in Mr. Vodder's trial (First Plea Agreement). In exchange for Mr. Stone's truthful testimony, the State agreed to dismiss his murder charge. Mr. Stone would then plead guilty to kidnapping with the State recommending his sentence run concurrent with his federal charges.[2] At Mr. Stone's request, the plea agreement was not reduced to writing.

In advance of Mr. Vodder's trial, Mr. Stone's attorney, Bryan Whitaker, informed Mr. Stone and the deputy prosecuting attorney, Mark Cipolla, of a scheduling conflict on the anticipated day of Mr. Stone's testimony. Neither Mr. Stone nor Mr. Cipolla opposed Mr. Whitaker's absence. Mr. Stone testified in Mr. Vodder's trial without the benefit of having Mr. Whitaker present. Mr. Stone's testimony proved to be untruthful, resulting in the court ordering a mistrial. As a result of Mr. Stone's untruthful testimony, the State withdrew the First Plea Agreement.

HEARING ON CrR 3.5 & MOTION TO ENFORCE FIRST PLEA AGREEMENT

With the assistance of new counsel, Timothy Trageser, Mr. Stone filed a motion to dismiss or, in the alternative, to enforce the First Plea Agreement. Mr. Stone further moved to suppress certain statements he had made to law enforcement officers and for a fact-finding hearing on the issues. The State agreed that a CrR 3.5 motion was necessary to adjudge the facts of the case.

The court conducted a joint evidentiary hearing on the motion to enforce the First Plea Agreement and a confession procedure under CrR 3.5. At the hearing, Mr. Stone testified that he was not informed that Mr. Whitaker would be absent from the trial and, during the brief conversation he had with Mr. Whitaker, he did not excuse Mr. Whitaker's presence. Mr. Stone also testified that Mr. Cipolla had not discussed Mr. Whitaker's absence until shortly before he testified and that Mr. Cipolla never informed him that he had a right to not testify.

The court also heard testimony from Mr. Whitaker and Mr. Cipolla. Mr. Whitaker testified that he spoke with Mr. Stone in advance of Mr. Vodder's trial. Mr. Whitaker testified he informed Mr. Stone that he had a conflict in his schedule, reiterated the importance of Mr. Stone testifying truthfully, and that Mr. Stone excused his presence from the trial. Mr. Cipolla testified that Mr. Whitaker had informed both he and Mr. Stone of his unavailability for trial. Mr. Cipolla testified that Mr. Stone agreed to

---

[2] The federal court sentenced Mr. Stone to 141 months' incarceration.

testifying without Mr. Whitaker being present. Mr. Cipolla further testified that he had a lengthy conversation with Mr. Stone, wherein he offered to move the date of Mr. Stone's testimony to accommodate Mr. Whitaker's schedule. Mr. Cipolla testified that Mr. Stone refused the accommodation, stating, "No, I'm good. I'm good to go. I want to get this over with." Rep. of Proc. (RP) at 74. During this time, Mr. Cipolla informed Mr. Stone that his plea deal was contingent on Mr. Stone offering truthful testimony. Mr. Cipolla also testified that immediately prior to Mr. Stone's testimony, he conferred with Mr. Stone and that "[Mr. Stone] affirmed in no uncertain terms that, yeah, he's ready to go." RP at 75.

After considering the testimony of Mr. Stone, Mr. Whitaker, Mr. Cipolla, and Detective Johnston, the trial court entered findings of fact and conclusions of law on the CrR 3.5 hearing. The court found Mr. Cipolla's and Mr. Whitaker's testimony demonstrated that Mr. Stone knowingly, intelligently, and voluntarily waived his rights under the Fifth Amendment to the United States Constitution, and that his statements were not coerced. The court concluded that Mr. Stone had breached the First Plea Agreement "by lying during his testimony." CP at 231.

The court later entered its findings of fact and conclusions of law on the motion to enforce the First Plea Agreement. These findings where in addition to the findings of the CrR 3.5 hearing. In its findings of fact related to the First Plea Agreement, the court found the testimony of Mr. Whitaker and Mr. Cipolla credible, and the testimony of Mr.

Stone not credible. The court found the First Plea Agreement was valid, determined that

Mr. Stone willfully breached the terms of the agreement, and denied Mr. Stone's motion

to enforce the First Plea Agreement.

SECOND PLEA AGREEMENT

A few weeks following the court's denial of his motion to enforce the First Plea

Agreement, Mr. Stone entered into a Second Plea Agreement with the State. Under the

terms of the Second Plea Agreement, Mr. Stone would plead guilty to second degree

murder in exchange for the State moving to dismiss the charges of first degree

kidnapping and conspiracy to commit first degree kidnapping and recommending to the

court that his sentence run concurrent to his 141-month federal sentence. On February

12, 2021, the State filed an amended information charging Mr. Stone with second degree

murder.

In pleading guilty to second degree murder, Mr. Stone signed a statement of

defendant on plea of guilty, wherein he acknowledged, "My lawyer has explained to me,

and we have fully discussed, all of the above paragraphs . . . . I understand them all. I

have been given a copy of this 'Statement of Defendant on Plea of Guilty.' I have no

further questions to ask the judge." CP at 249. Mr. Stone's attorney signed the statement

of defendant on plea of guilty claiming, "I have read and discussed this statement with

the defendant. I believe that the defendant is competent and fully understands the

statement." CP at 249. In accepting Mr. Stone's guilty plea, the trial court found "the

7

defendant's plea of guilty to be knowingly, intelligently and voluntarily made. Defendant understands the charges and the consequences of the plea. There is a factual basis for the plea. The defendant is guilty as charged." CP at 250.

In honoring the terms of the Second Plea Agreement, on March 9, 2021, the court sentenced Mr. Stone to 254 months' confinement to be served concurrent with his federal sentence. The judgment and sentence ordered Mr. Stone to serve 36-months' community custody and required him to pay any supervision fees as determined by the Department of Corrections. Mr. Stone was also ordered to pay a $500 victim penalty assessment (VPA), a $200 criminal filing fee, and a $100 DNA collection fee.

Mr. Stone timely appeals.

## ANALYSIS

On appeal, Mr. Stone contends he was denied his Sixth Amendment right to consult with counsel before testifying at Mr. Vodder's trial and that the trial court erred when it imposed certain LFOs. He requests the First Plea Agreement be reinstated and that the LFOs be excised from his judgment and sentence.

We agree with the State's argument that Mr. Stone's guilty plea constitutes a waiver of his ability to challenge the trial court's denial of his motion to enforce the First Plea Agreement. Accordingly, we need not address Mr. Stone's remaining contentions. Further, we accept the State's concession related to Mr. Stone's LFOs.

8

WAIVER OF APPELLATE REVIEW

An accused's plea of guilty limits their right of appellate review as it generally constitutes a waiver of the right. *State v. Majors*, 94 Wn.2d 354, 356, 616 P.2d 1237 (1980). This is due to a guilty plea being more than an accused's admission of various acts. *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S. Ct. 1709, 23 L. Ed. 2d 274 (1969). Once a guilty plea is accepted by the court, the only remaining task is to give judgment and determine punishment. *Id.*

A guilty plea does not, however, foreclose all avenues of review. Following a guilty plea, a defendant may appeal sentencing errors and collateral questions such as the validity of a statute, sufficiency of the information, jurisdiction of the court, or the voluntariness of the plea. *In re Pers. Restraint of Schorr*, 191 Wn.2d 315, 322-23, 422 P.3d 451 (2018); *State v. Peltier*, 181 Wn.2d 290, 294-95, 332 P.3d 457 (2014). Absent from such collateral attack is a defendant's ability to appeal the denial of any pretrial motions. *State v. Olson*, 73 Wn. App. 348, 353, 869 P.2d 110 (1994). Forsooth, the Supreme Court has long held:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of

9

the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann*.[3]

*Tollett v. Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 36 L. Ed. 2d 235 (1973).

Our State has followed federal precedent. "It is well established in Washington that a defendant may waive his right to direct appeal." *In re Pers. Restraint of Amos*, 1 Wn. App. 2d 578, 591, 406 P.3d 707 (2017) (citing *State v. Smith*, 134 Wn.2d 849, 852, 953 P.2d 810 (1998)). However, in order for that waiver to be upheld, the State has the burden of showing that a defendant made a "'voluntary, knowing, and intelligent waiver of the right to appeal.'" *Id.* (quoting *State v. Sweet*, 90 Wn.2d 282, 286, 581 P.2d 579 (1978)). To meet this burden, the State must show the defendant understood his right to appeal and the effect of waiving his right. *State v. Kells*, 134 Wn.2d 309, 314, 949 P.2d 818 (1998). There is no presumption of waiver simply because a defendant pleaded guilty to a criminal charge. *Id.*

"When a defendant completes a plea statement and admits to reading, understanding, and signing it, this creates a strong presumption that the plea is voluntary." *Smith*, 134 Wn.2d at 852 (citing *State v. Perez*, 33 Wn. App. 258, 261, 654 P.2d 708 (1982)). A criminal defendant can rebut this presumption with evidence the plea was not made knowingly, intelligently, or voluntarily. *Id.*

---

[3] *McMann v. Richardson*, 397 U.S. 759, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970).

Mr. Stone signed the 12-page statement of defendant on plea of guilty, wherein he acknowledged, "My lawyer has explained to me, and we have fully discussed, all of the above paragraphs . . . .  I understand them all."  CP at 249.  Mr. Stone's attorney also signed the statement on plea of guilty, claiming, "I have read and discussed this statement with the defendant.  I believe that the defendant is competent and fully understands the statement."  CP at 249.  In accepting Mr. Stone's guilty plea, the trial court found "the defendant's plea of guilty to be knowingly, intelligently and voluntarily made.  Defendant understands the charges and the consequences of the plea.  There is a factual basis for the plea.  The defendant is guilty as charged."  CP at 250.  Accordingly, there exists a strong presumption that Mr. Stone entered his guilty plea intelligently, voluntarily, and with an understanding of the consequences.

In response to the State's argument that his guilty plea constitutes a waiver of his ability to appeal the denial of his motion to enforce the First Plea Agreement, Mr. Stone neglects to put forth any evidence to rebut the strong presumption that his plea was not made knowingly, intelligently, or voluntarily.  Consequently, Mr. Stone has waived his right to appeal the trial court's denial of his motion to enforce the First Plea Agreement.

LEGAL FINANCIAL OBLIGATIONS

Mr. Stone argues that the trial court erred in imposing LFOs due to his status as an indigent defendant.[4] The State concedes Mr. Stone is indigent and the LFOs should be eliminated from the judgment and sentence.

RCW 36.18.020(2)(h) prohibits the imposition of a criminal filing fee on a defendant who is found to be indigent under RCW 10.01.160(3). Given the State's agreement that Mr. Stone is indigent, the trial court is directed to strike the $200 criminal filing fee from the judgment and sentence.

Prior to July 1, 2023, imposition of a VPA was mandatory for any individual found guilty of a crime in superior court. Former RCW 7.68.035(1)(a) (2018). However, Engrossed Substitute H.B. 1169, 68th Leg., Reg. Sess. (2023), amended RCW 7.68.035 to provide, "The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1. Generally, when a statute is amended while a case is pending on direct appeal, the amendment will apply. *State v. Ramirez*, 191

---

[4] Aside from the three LFOs discussed herein, the judgment and sentence included a DNA collection fee. While we do not raise issues sua sponte for the parties, DNA collection fees became waivable after July 1, 2023, following an amendment to RCW 43.43.7541. *State v. Ellis*, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023) (citing LAWS OF 2023, ch. 449, § 4).

No. 38808-5-III
*State v. Stone*

Wn.2d 732, 748-49, 426 P.3d 714 (2018).  Because Mr. Stone is indigent, the trial court is directed to strike the $500 VPA from the judgment and sentence.

Further, effective July 1, 2022, RCW 9.94A.703(2) no longer authorizes the imposition of community custody supervision fees.  *State v. Ellis*, 27 Wn. App. 2d 1, 17, 530 P.3d 1048 (2023) (citing LAWS OF 2022, ch. 29, § 7).  Because Mr. Stone's case is pending on direct review, he receives the benefit of this amendment.  The trial court is directed to strike the community custody supervision fee from the judgment and sentence.

## CONCLUSION

We deny Mr. Stone's request to order the First Plea Agreement reinstated and remand for the trial court to strike the LFOs from the judgment and sentence.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Cooney, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Staab, J.

13